IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 20, 2024 Session

**VIDAFUEL, INC. v. KERRY, INC.**

**Appeal from the Circuit Court for Davidson County**
**No. 23C1270          Joseph P. Binkley, Jr., Judge**

_____

**No. M2024-00041-COA-R3-CV**
_____

This is a case involving a contractual relationship between sophisticated business entities in which the Plaintiff-Appellant agreed to order beverage products manufactured by the Defendant-Appellee. The delivered products were nonconforming, and the Plaintiff-Appellant thereafter filed suit asserting common law tort claims and alleging violation of the Tennessee Consumer Protection Act. Upon motion of the Defendant-Appellee, however, the trial court dismissed the lawsuit. As part of its order of dismissal, the trial court held that the asserted common law tort claims were barred by the economic loss doctrine and ruled that the Tennessee Consumer Protection Act claim was barred by the statute of limitations. For the reasons stated herein, we affirm the trial court's judgment of dismissal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded.**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and KENNY ARMSTRONG, J., joined.

Kevin C. Baltz, Nashville, Tennessee, and Cynthia L. Saiter and S. Abraham Kuczaj, III, Austin, Texas, for the appellant, Vidafuel, Inc.

John L. Farringer, IV, and Hunter Branstetter, Nashville, Tennessee, and David J. Turek, Milwaukee, Wisconsin, for the appellee, Kerry, Inc.

**OPINION**

**BACKGROUND AND PROCEDURAL HISTORY**

This appeal, which involves a dispute between Vidafuel, Inc. ("Vidafuel") and Kerry, Inc. ("Kerry"), stems from the trial court's dismissal of litigation that Vidafuel

pursued against Kerry for the alleged violation of the Tennessee Consumer Protection Act, "negligent and/or intentional misrepresentation," and "deceit/fraudulent inducement." As discussed below, although the trial court dismissed Vidafuel's common law tort claims due to its determination that the economic loss doctrine barred them, it dismissed the consumer protection act claim because, in addition to another cited basis, the court determined that Vidafuel had not timely asserted the claim. Before turning to the propriety of these rulings, however, it is of course necessary that we first consider the general background surrounding the parties, their business relationship, and the various allegations that Vidafuel brought against Kerry in support of its legal claims.

Per the amended complaint that was dismissed by the trial court,[1] Vidafuel is a company that develops, markets, and distributes wellness protein drinks and nutritional supplements. Although it was only founded in 2017, Vidafuel had secured national contracts by 2019 with the third and fourth largest dialysis providers in the country.

Of note to the present dispute, Vidafuel does not have its own manufacturing facilities, and in 2020, it began collaborating with Kerry regarding the possibility that Kerry would manufacture Vidafuel's Mixed Berry Protein Beverage and Citrus Burst Protein Beverage (collectively "Products"). According to Vidafuel, Kerry held itself out to be an industry leader and the gold standard in food manufacturing, and allegedly, Kerry "repeatedly assured and guaranteed they could both manufacture the Products and keep up with the anticipated growth in demand." Although Kerry's operation of aseptic co-packer facilities was in contrast to the "hot-fill" facility of Vidafuel's existing manufacturer at the time, Kerry represented that its research and development ("R&D") team had the necessary expertise to create a formula that would allow Kerry to easily provide the manufacturing services that Vidafuel required.

Vidafuel worked with Kerry's R&D and regulatory teams on product formulation and packaging through the spring of 2020, and Kerry represented that its facility in Savannah, Georgia, could produce the Products. Vidafuel continued collaborating with Kerry's R&D team, and in October 2020, Kerry sent samples for Vidafuel to test. Vidafuel let Kerry know that these samples were "unacceptable," and Kerry delivered additional samples in January 2021. The January 2021 samples closely replicated the viscosity, texture, and taste that Vidafuel and its customers expected for the Products, and thereafter, Vidafuel and Kerry representatives met via Teams to discuss moving forward. According to Vidafuel, Kerry represented during this Teams call that the formulation used to create the January samples was a stable formula and that Kerry would be able to produce the Products at its Savannah facility using that formulation. It was at this point that Vidafuel decided to commit to Kerry for manufacturing.

---

[1] Because the claims at issue on appeal were resolved at the motion to dismiss stage, our presentation of the background facts is derived from the operative complaint.

Three weeks after securing Vidafuel's commitment to move over to Kerry for manufacturing services, Kerry told Vidafuel that the January formulation was not stable or producible and would need to be significantly revised. Although Vidafuel was caught off guard by this news, Kerry reassured Vidafuel that its R&D team knew how to correct the issue. Vidafuel worked with Kerry's R&D team to adjust the formula and make it market ready, and in April 2021, Kerry sent the next set of samples to Vidafuel. Allegedly, these samples were a "disaster."

Vidafuel and Kerry thereafter convened another Teams call, during which Kerry's R&D team discussed numerous "fixes" and provided reassurances. Additional reassurances were made in emails and conversations following the Teams call, and Vidafuel ultimately entered into a Manufacturing and Supply Agreement ("MSA") with Kerry effective June 18, 2021. Kerry warranted that its manufacturing services would be provided consistent with "good manufacturing practices" and applicable laws and regulations, and further, Kerry warranted that, as of the date of delivery to Vidafuel, the Products would conform in all material respects to the "Specifications" set forth in the MSA. In return, the MSA made Kerry the sole and exclusive manufacturer of the Products and obligated Vidafuel to minimum order commitments for a three-year term.

Following the parties' entry into the MSA, Vidafuel awaited its first shipment of market-ready Products. The first shipment was later delivered to Vidafuel's warehouses in August 2021, but Vidafuel soon began receiving numerous customer complaints about the "thickness of the product" and about leaks caused by improper packaging. According to Vidafuel, it incurred the expense of attempting to replace the Products at no cost to its customers but was ultimately forced to provide refunds. Vidafuel later informed Kerry that it was losing customers and market share "due to the prior failed production."

In calls that took place to discuss formulation issues, Kerry admitted that the failed production had used 17g of protein even though that formula had never been sampled or approved by Vidafuel. Kerry, however, reassured Vidafuel that issues had been taken care of and addressed. Kerry also informed Vidafuel that the package leaks associated with the first shipment had been the result of "machine failure" and not enough glue being added during the manufacturing process. When Vidafuel's CEO asked for production to be moved to another Kerry plant due to concerns with the quality standards of the manufacturing processes at the Savannah plant, Kerry informed Vidafuel that production would not be moved and represented that the issues at the Savannah plant had been resolved.

Kerry produced another run of test samples in October 2021. Vidafuel's CEO stated that the Citrus Burst Protein Beverage was "PERFECTION," and Vidafuel informed Kerry that the formulation of the Mixed Berry Protein Beverage was good enough to go to market as well. When Vidafuel subsequently inquired into the status of production in November 2021 and stressed the urgency of getting quality products to market, Kerry represented that

- 3 -

the Products would be available to ship by December 30, 2021.

On December 21, 2021, however, a Kerry representative informed Vidafuel that the Mixed Berry Protein Beverage was awaiting testing, and that Kerry did not believe it would be ready for shipment on December 30, 2021. On a later Teams call that was convened after Vidafuel pressed for answers, Kerry provided reassurance that the Savannah facility could produce the Products. Vidafuel continued to work with Kerry and stressed the importance of using the correct formulation and correct packaging. Kerry representatives reassured Vidafuel that they would do so.

Kerry eventually shipped the Products to Vidafuel's warehouses in February 2022 and invoiced Vidafuel over $91,000.00 for the shipment. According to Vidafuel, by submitting that invoice, Kerry represented pursuant to the MSA that the Products complied with the "Specifications." Allegedly, however, this February shipment was also "non-conforming," and Vidafuel was forced to pull all inventory from the market. Although Kerry provided reassurance in early March 2022 that it was working on, and correcting, the manufacturing issues, Kerry emailed Vidafuel a letter on March 22, 2022, to provide notification that it was terminating the MSA. As alleged by Vidafuel in its amended complaint, Kerry "conceded defeat" on this date.

According to Vidafuel, Kerry had previously indicated that it made more sense from a business standpoint for it to focus on its larger customers that had more straightforward products to manufacture. When Vidafuel's CEO informed Kerry that Kerry's action would leave Vidafuel with no inventory, Kerry represented that it would attempt another production run of the Products while Vidafuel looked for another manufacturer.

Vidafuel received additional samples of the Mixed Berry Protein Beverage and Citrus Burst Protein Beverage on May 31, 2022, and June 2, 2022, respectively. The Mixed Berry Protein Beverage was deemed unmarketable and the "least palatable product to date," and the Citrus Burst Protein Beverage was considered by Vidafuel's CEO to be "in even worse shape than the Berry." Another Teams call was set up for June 3, 2022, and during that call, Kerry representatives confirmed that the Products had not been manufactured correctly. According to Vidafuel, Kerry representatives admitted that the quality problems associated with this latest run were not attributable to the formulation the parties had agreed upon for the Products; rather, Kerry representatives admitted that the problems were due to previously undisclosed manufacturing, staffing, and equipment issues. Vidafuel has maintained that this June 3, 2022, call was the first time it learned of the significant manufacturing and equipment issues at the Savannah plant. As specifically related in its amended complaint, Vidafuel alleged as follows on this point:

Based on Kerry's prior representations and reassurances that manufacturing issues had been resolved, the June 3, 2022 call was the first time that Vidafuel had reason to learn that Kerry's inability to provide the manufacturing

services was not primarily due to difficulties with the formulation that it represented Kerry R&D had the expertise to provide, but rather with ongoing manufacturing, staffing, and equipment issues that Kerry was aware of but failed to disclose.

Vidafuel commenced the present litigation on June 1, 2023. In its later-filed amended complaint, which chronicled the history outlined above, Vidafuel alleged that Kerry "knew its representations that the Products would be manufactured in compliance with the agreed formula, with good manufacturing practices and quality assurance were false when made," and Vidafuel further averred that Kerry "knew its representations that it had resolved certain manufacturing issues were false when made." In addition, Vidafuel claimed that Kerry "knew its representations about [its] ability to manufacture the Products at its Savannah, Georgia facility were false when made." According to Vidafuel, Kerry made its representations to induce Vidafuel to start using and to continue to use Kerry as the sole and exclusive manufacturer of the Products.

Of note, Vidafuel specifically emphasized within its amended complaint that it was "not asserting claims based on the MSA."[2] Instead, as we referenced earlier, the specific claims asserted by Vidafuel were for violation of the Tennessee Consumer Protection Act ("TCPA"), for "negligent and/or intentional misrepresentation," and for "deceit/fraudulent inducement."

In response to Vidafuel's action, Kerry moved to dismiss the amended complaint pursuant to Rule 12.02(6) of the Tennessee Rules of Civil Procedure and argued that Vidafuel "cannot avoid the terms of the MSA by creatively repackaging its potential breach-of-contract claims as a tort / consumer protection case." Kerry contended that Vidafuel's common law tort claims failed as a matter of law because the economic loss doctrine required Vidafuel to pursue recovery of its alleged economic losses under the terms of the MSA, not through general common law tort claims.[3] This was true, Kerry argued, despite Vidafuel's efforts to recharacterize the MSA as a contract for manufacturing services rather than the sale of goods. As for the TCPA claim, Kerry in part argued that Vidafuel's complaint fell outside the statutory text because Vidafuel was not an "individual" and did not purchase any "goods" within the TCPA statutory definition. Further, Kerry maintained that Vidafuel's TCPA claim was "time barred by the one-year statute of limitations" given that Vidafuel "knew of its alleged injuries from almost the outset of the parties' contractual relationship."

---

[2] A footnote concerning the matter read in full as follows: "As set forth below, after Kerry admitted it was unable to meet its contractual obligations, it terminated the MSA. Vidafuel is pursuing only the tort claims asserted herein and is not asserting claims based on the MSA."

[3] According to Kerry, Vidafuel's common law tort claims also required dismissal because the amended complaint lacked "the particularity required by Tenn. R. Civ. P. 9.02" and failed to identify any actionable statements Kerry made that could lead to tort liability.

The trial court ultimately agreed with Kerry that Vidafuel's amended complaint warranted dismissal. As reflected in an oral ruling that was incorporated by reference into the court's written order of dismissal, the trial court held that Vidafuel "missed the statute of limitations on the TCPA claim," specifically holding that the cause action for a TCPA claim accrued "at the very latest . . . when the defendant Kerry . . . 'conceded defeat' as cited in paragraph 25 of the complaint. And that was March of 2022." The trial court found further support for dismissal of the TCPA claim, however, based on the perceived relevance of the TCPA definition of "goods," which, under Tennessee Code Annotated section 47-18-103, means "any tangible chattels leased, bought, or otherwise obtained for use by an individual primarily for personal, family, or household purposes or a franchise, distributorship agreement, or similar business opportunity." Tenn. Code Ann. § 47-18-103(12). Focusing, in part, on the "individual" language in the definition, and equating the ordinary meaning of that language as connoting a human being or a person, the trial court noted that Vidafuel was not a human being but instead a corporate entity.

In dismissing Vidafuel's common law tort claims, the trial court opined that the case before it was "basically a products liability claim" and that the economic loss doctrine applied. In connection with its ruling, the trial court emphasized that it was not looking to anything outside of the complaint, stating, "I just have the complaint to look at, period. That's it. And that's what I'm doing in making my decision . . . ."

This appeal followed.

**ISSUES PRESENTED**

Vidafuel has raised several issues for our review. In its principal appellate brief, it raises the following matters, which we have slightly restated:

1. Whether the trial court erred in holding that Vidafuel's amended complaint failed to state a claim upon which relief can be granted.
2. Whether the trial court erred by holding that this was a products liability case.
3. Whether the trial court erred by applying the economic loss rule to Vidafuel's common law tort claims based on misrepresentations related to Kerry's services, qualifications, and capabilities.
4. Whether the trial court erred by concluding, prior to discovery, the predominant purpose of the relationship between Kerry and Vidafuel.
5. Whether the trial court erred in concluding that Vidafuel, a corporation, is not permitted to pursue claims under the TCPA.
6. Whether the trial court erred by concluding that Vidafuel's TCPA claim was time-barred.

Kerry's appellate brief also presents several issues for review. Although some of these issues overlap with the matters raised by Vidafuel, Kerry also broaches a couple of

questions that are independent. Slightly restated, its raised issues are as follows:

1. Should the trial court's dismissal of Vidafuel's claims of negligent misrepresentation, intentional misrepresentation, and fraudulent inducement based on application of the economic loss doctrine be affirmed?
2. Is the contract upon which Vidafuel's claims are founded a part of the pleadings for all purposes pursuant to Tennessee Rule of Civil Procedure 10.03?
3. Should the trial court's dismissal of Vidafuel's claim under the TCPA for failure to state a claim upon which relief can be granted be affirmed?
4. Should the trial court's dismissal of Vidafuel's claim under the TCPA be affirmed on the additional ground that it is barred by the applicable statute of limitations?
5. If this Court affirms the trial court's dismissal of Vidafuel's claims, is Kerry entitled to costs and reasonable and necessary attorney's fees on remand pursuant to Tennessee Code Annotated section 20-12-119?

## STANDARD OF REVIEW

"A Rule 12.02(6) motion challenges only the legal sufficiency of the complaint, not the strength of the plaintiff's proof or evidence." *Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 426 (Tenn. 2011). Resolution of the motion "is determined by an examination of the pleadings alone," *id.*, and on appeal, we review the trial court's action de novo, with no presumption of correctness. *In re Estate of Starkey*, 556 S.W.3d 811, 815 (Tenn. Ct. App. 2018). Just as the resolution of a motion to dismiss involves a question of law to which we afford no deference, a trial court's determination as to whether the economic loss doctrine applies likewise presents a legal question. *Com. Painting Co. Inc. v. Weitz Co. LLC*, 676 S.W.3d 527, 532 (Tenn. 2023) ("The question of whether the economic loss doctrine applies in this case is a matter of law which we review de novo.").

## DISCUSSION

We begin our substantive discussion by considering the merits of the trial court's decision to dismiss Vidafuel's common law tort claims. Vidafuel raises a number of specific issues concerning this matter, all of which ultimately pertain to the propriety of the trial court's conclusion that the economic loss doctrine applies. For the reasons stated below, we discern no error in the trial court's conclusion that the economic loss doctrine bars the maintenance of Vidafuel's common law tort claims.

The economic loss doctrine, which is a "judicially-created rule of relatively recent vintage," *Milan Supply Chain Sols., Inc. v. Navistar, Inc.*, 627 S.W.3d 125, 142 (Tenn. 2021), "operates generally to preclude contracting parties from pursuing tort recovery for purely economic or commercial losses associated with the contract relationship." *Id.*

(quoting *Plourde Sand & Gravel v. JGI E., Inc.*, 154 N.H. 791, 917 A.2d 1250, 1253 (2007)). The doctrine "was developed in response to modern products liability law from a concern that products liability and tort law would erode or consume contract law," *id.*, and the purpose of the rule is to preserve the important distinction between the law of contracts and torts and to prevent the "tortification" of contract law. *Com. Painting Co. Inc.*, 676 S.W.3d at 532 (quoting Jeffrey L. Goodman, Daniel R. Peacock & Kevin J. Rutan, *A Guide to Understanding the Economic Loss Doctrine*, 67 Drake L. Rev. 1, 3-4 (2019)). Of note to the dispute between the parties on appeal, the Tennessee Supreme Court has held that application of the economic loss doctrine "is limited to products liability cases." *Com. Painting Co. Inc.*, 676 S.W.3d at 528. The doctrine does not extend, therefore, to services contracts. *Id.* at 540.

This latter point—that the economic loss doctrine is limited to products liability cases and does not extend to services contracts—is a central theme of Vidafuel's argument on appeal as to why the trial court erred in applying the economic loss doctrine to bar its common law tort claims. Vidafuel stresses that its amended complaint focuses on alleged misrepresentations about Kerry's services and contends that "this is not a products liability case." In an attempt to bolster this contention, Vidafuel even asserts that its common law tort claims "do not seek recovery for damages caused by goods that Kerry sold to Vidafuel." But how is that so? Respectfully, we are of the opinion that Vidafuel's conclusory statement concerning that matter on appeal is belied by its own pleading. As chronicled earlier, the amended complaint is littered with assertions concerning Kerry's performance under the MSA, its delivery of the Products in a non-conforming state, and associated damages to Vidafuel as a result. The first shipment of the Products, for instance, prompted "numerous customer complaints," and according to Vidafuel, it "incurred the expense of attempting to replace many Products at no cost to its customers, but was ultimately forced to provide refunds." The amended complaint further pointed to loss of market share and a damaged reputation sustained in the wake of Kerry's "botched production," and after the shipment of the Products in February 2022 was also "non-conforming," Vidafuel "was forced to pull all inventory from the market." Although without question Vidafuel alleges that it suffered damages as a result of relying upon certain misrepresentations from Kerry, there is a clear link in its pleading between the claimed damages and Kerry's alleged lack of adequate performance under the MSA. Both of the common law tort counts, for example, prominently allege as follows: "Vidafuel reasonably relied on Kerry's misrepresentations, and suffered damages as a result, including, *inter alia*, losing $8,825,000 in client contracts that would have resulted in millions of dollars of future profits <u>had Kerry adequately and timely performed</u>."[4] (emphasis added) Vidafuel's attempt to nominally untether the connection between its claimed damages and the Products/Kerry's performance under the MSA is simply not tenable. As Kerry offered in support of its motion to dismiss in the trial court: "The entire

---

[4] As a technical matter, we observe that the pleaded count for "deceit/fraudulent inducement" also contained the modifier "existing" before "client contracts" within this allegation.

thesis of the Amended Complaint is that Kerry supplied VidaFuel with defective Products, which caused VidaFuel to lose customers and sales. That claim fits squarely within the definition of 'products liability.'"

Indeed, despite Vidafuel's bare assertion that "this is not a products liability case," the amended complaint clearly signifies otherwise. After all, products liability, as a general concept, involves a "manufacturer's or seller's liability for any damages or injuries suffered by a buyer, user, or bystander as a result of a defective product." *City of Franklin v. W.L. Hailey & Co., Inc.*, 634 S.W.3d 16, 27 (Tenn. Ct. App. 2019) (quoting *Black's Law Dictionary* 1328 (9th ed. 2009)). Again, here, the amended complaint plainly points to damages suffered because of alleged issues with the Products that Kerry delivered under the MSA, an agreement which was not a services contract but instead involved the provision of goods to Vidafuel.[5] Given this nature of the case, it does implicate, as the trial

---

[5] We are able to reach our conclusion on this issue without examination of the written MSA document itself (which is within the technical record attached to a memorandum filed by Kerry but not attached to the complaint); the nature of the MSA is clearly discernible from the complaint's allegations. Despite Vidafuel's assertion in the amended complaint that the first word in the title of the MSA—manufacturing—indicates that "Vidafuel entered the MSA for the purpose of securing manufacturing services," the MSA is clearly not a services contract. As evidenced by the allegations in the amended complaint, the MSA is clearly an agreement under which Kerry would supply, and Vidafuel would purchase, goods, i.e., the Products. This reality rings true despite the amended complaint's frequent invocation of "services" terminology. Consider, for instance, paragraph fourteen of the amended complaint in which the MSA is discussed: "Kerry . . . warranted that as of the date of delivery to Vidafuel, the Products will conform in all material respects to the Specifications set forth in the MSA. In return for providing those manufacturing services, the MSA made Kerry the sole and exclusive manufacturer of the Products and if and when manufactured obligated Vidafuel to minimum order commitments for a three-year term." Again, the MSA is clearly about the provision of goods, with Kerry the supplier and Vidafuel the purchaser. Paragraph twenty-four of the amended complaint, which discusses Kerry's shipment of the Products to Vidafuel's warehouses in February 2022 and issuance of an invoice for that shipment, also brings the reality of this relationship into clear focus: "Pursuant to the MSA, by submitting that invoice (or any prior invoices) to Vidafuel's office in Nashville, Tennessee, Kerry represented that the Products complied with the Specifications."

Through one of its raised issues, Kerry asserts that the written MSA document should be considered to be a part of the pleadings because, according to Kerry, Vidafuel's common law tort claims are founded upon the MSA. In support of its position, Kerry cites, among other cases, this Court's decisions in *Fitzgerald v. Hickman County Government* and *Belton v. City of Memphis*. *See Fitzgerald v. Hickman Cnty. Gov't*, No. M2017-00565-COA-R3-CV, 2018 WL 1634111, at *3 (Tenn. Ct. App. Apr. 4, 2018) ("Where documents are required to be attached to a complaint in conformity with Rule 10.03 [of the Tennessee Rules of Civil Procedure], consideration of those documents by the trial court does not convert a motion to dismiss to a motion for summary judgment."); *Belton v. City of Memphis*, No. W2015-01785-COA-R3-CV, 2016 WL 2754407, at *4 (Tenn. Ct. App. May 10, 2016) ("[A] plaintiff should not be entitled to avoid a motion to dismiss in reliance upon Rule 10.03 exhibits by simply shirking its duty to properly attach such exhibits."). Vidafuel, in turn, emphasizes that it is not suing for breach of the MSA. During oral argument on appeal, it should be noted that Kerry, although not withdrawing its contention that the trial court should have considered the written MSA document when ruling on the motion to dismiss, argued that the trial court's holding pertaining to the economic loss doctrine was supportable without it having

court found, the economic loss doctrine. *See Com. Painting Co. Inc.*, 676 S.W.3d at 532 (noting that the "economic loss doctrine is implicated in products liability cases when a defective product damages itself without causing personal injury or damage to other property" (quoting *Lincoln General Ins. Co. v. Detroit Diesel Corp.*, 293 S.W.3d 487, 489 (Tenn. 2009))).

Vidafuel nonetheless insists that the economic loss doctrine cannot apply here because, according to it, the doctrine only applies when the only misrepresentations at issue concern the quality or character of goods sold. In connection with this argument, Vidafuel emphasizes that its common law tort claims are based on misrepresentations regarding services, not misrepresentations concerning the quality or character of goods sold. As discussed below, we do not find merit in Vidafuel's position.

Vidafuel's argument on this matter relies on language included in *Milan*, a products liability case where the Tennessee Supreme Court considered whether the economic loss doctrine applies to fraud claims. *Milan*, 627 S.W.3d at 153. After evaluating various approaches other courts had taken with respect to that question, the Tennessee Supreme Court ultimately "decline[d] to announce a broad rule either extending the economic loss rule to all fraud claims or exempting all fraud claims from the economic loss rule." *Id.* Rather, the Tennessee Supreme Court simply held that "for situations . . . involving a contract between sophisticated commercial business entities and a fraudulent inducement claim seeking recovery of economic losses only, the economic loss doctrine applies if 'the only misrepresentation[s] by the dishonest party concern[] the quality or character of the goods sold.'" *Id.* at 153-54.

Initially, we observe that such a holding did not, as Vidafuel argues, say the economic loss doctrine *only* applies if the only misrepresentations at issue concern the quality or character of goods sold. The Tennessee Supreme Court simply held that the doctrine does apply when, in addition to the other circumstances discussed therein, the only misrepresentations by the dishonest party concern the quality or character of the goods sold. In any event, we do not regard Vidafuel's point of emphasis to be persuasive. The alleged misrepresentations at issue here pertain to such matters as Kerry's capabilities of reformulating the Products, the manufacturing of the Products, quality control at the Savannah plant, and Kerry's ability to deliver the Products. Even if some or all of the misrepresentations are not viewed to concern the quality and character of the Products per

---

done so. We specifically agree with Kerry regarding this latter point, and like the trial court, we are able to reach our conclusion that the economic loss doctrine applies based on the allegations in the complaint alone. Because we are able to reach the same conclusion that the trial court did without consideration of the written MSA document that was included within the record, we pretermit any definitive assessment of whether the trial court should have considered that exhibit to be a part of the complaint.

se, they all implicate the subject matter of the parties' contract and expected performance under it. In our view, this overlap between the alleged misrepresentations and the subject matter of the parties' contract warrants application of the economic loss doctrine, and we are of the opinion that such an approach is consistent with the rationale employed by the Tennessee Supreme Court in *Milan*. Indeed, within its decision in *Milan*, the Tennessee Supreme Court emphasized that, in the circumstances discussed therein, there was an opportunity to negotiate a warranty and other terms to account for possible defects in the goods. *Id.* at 154. Likewise, it noted that the fraud at issue therein involved "matters about which the parties could and actually did contract." *Id.* The Tennessee Supreme Court specifically reasoned that, "[w]hen the alleged fraud concerns pre-contractual misrepresentations and nondisclosures about the quality, reliability, and character of the goods that are the subject of a contract between sophisticated business entities, Tennessee's interest in freedom of contract prevails, and the economic loss doctrine applies." *Id.* The same interest in freedom of contract applies here inasmuch as the misrepresentations at issue implicate the subject matter and performance of the contract. The alleged misrepresentations clearly concern matters about which the parties could have contracted incident to entry into the MSA.[6]

In sum, because the amended complaint indicates that this is a products liability case between two sophisticated business entities that entered into a contract, involves an attempt to recover only economic losses, and involves tort claims that concern the subject matter of the contract, we conclude that the common law tort claims asserted by Vidafuel are barred by the economic loss doctrine.[7] The trial court's judgment on that issue is therefore affirmed.

We next turn to the trial court's dismissal of Vidafuel's TCPA claim and specifically consider its conclusion that the TCPA claim was barred by the statute of limitations. The

---

[6] Per the amended complaint, the MSA even broached the general subject—representations regarding Kerry's services—that Vidafuel emphasizes its common law tort claims are based upon. Indeed, according to the amended complaint, "Kerry warranted that its manufacturing services would be provided consistent with 'good manufacturing practices' and applicable laws and regulations."

[7] Not only do we regard our conclusion to be consistent with the rationale employed by the Tennessee Supreme Court in *Milan*, we find it to resonate generally with conceptual frameworks undergirding the economic loss doctrine as articulated by several courts outside Tennessee. *See, e.g., HealthBanc Int'l, LLC v. Synergy Worldwide, Inc.*, 435 P.3d 193, 196 (Utah 2018) (noting that, under one branch of Utah's economic loss rule, parties are not permitted to assert actions in tort when a conflict arises between parties to a contract regarding the subject matter of that contract); *Carando Gourmet Frozen Foods Corp., Inc. v. Axis Automation, LLC*, 458 F. Supp. 3d 60, 73 (D. Mass. 2020) (discussing that, under Wisconsin law, a fraud exception to the economic loss doctrine is not applicable where the alleged misrepresentation relates to the subject matter of the contract, as the parties could have protected themselves through contract negotiations); *United Vaccines, Inc. v. Diamond Animal Health, Inc.*, 409 F. Supp. 2d 1083, 1094 (W.D. Wis. 2006) (noting that the plaintiff's claim rested on the defendant's allegedly fraudulent statements that it was capable of producing vaccines in sufficient quantities and potency, opining that such misrepresentations related to performance under the contract, and holding that the plaintiff's tort claim for misrepresentation was barred by the economic loss doctrine).

- 11 -

applicable limitation statute, which is codified at Tennessee Code Annotated section 47-18-110, provides that the action "shall be brought within one (1) year from a person's discovery of the unlawful act or practice." Tenn. Code Ann. § 47-18-110. As we have previously noted, this statute makes the discovery rule applicable by conditioning accrual of a TCPA claim on the "discovery of the unlawful act or practice." *Schmank v. Sonic Auto., Inc.*, No. E2007-01857-COA-R3-CV, 2008 WL 2078076, at \*2 (Tenn. Ct. App. May 16, 2008). The discovery rule "is an equitable exception that tolls the running of the statute of limitations until the plaintiff knows, or in the exercise of reasonable care and diligence, should know that an injury has been sustained." *Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d 614, 621 (Tenn. 2002). Importantly, however, the discovery rule "does not . . . toll the statute of limitations until the plaintiff *actually* knows that he or she has a cause of action." *Id.* Rather, as the Tennessee Supreme Court has explained, "[t]he plaintiff is deemed to have discovered the right of action when the plaintiff becomes aware of facts sufficient to put a reasonable person on notice that he or she has suffered an injury as a result of the defendant's wrongful conduct." *Id.* Although whether the plaintiff exercised reasonable care and diligence in discovering the injury or wrong is often a fact question for the jury to determine, Tennessee case law affirms the propriety of dismissing a complaint when "no reasonable trier of fact could conclude that a plaintiff did not know, or in the exercise of reasonable care and diligence should not have known, that he or she was injured as a result of the defendant's wrongful conduct." *Schmank*, 2008 WL 2078076, at \*3.

Moreover, the discovery rule "does not allow the plaintiff to delay filing suit until she knows the full extent of her damages, or the specific type of legal claim she has." *Eldridge v. Savage*, No. M2016-01373-COA-R3-CV, 2017 WL 5901028, at \*5 (Tenn. Ct. App. Nov. 29, 2017). Rather, as this Court has explained:

> Constructive or "inquiry" notice occurs "when the plaintiff has actual knowledge of facts sufficient to put a reasonable person on notice that he or she has suffered an injury as a result of wrongful conduct." In other words, "inquiry notice 'charges a plaintiff with knowledge of those facts that a reasonable investigation would have disclosed.'" Once the plaintiff "gains information sufficient to alert a reasonable person of the need to investigate 'the injury,' the limitation period begins to run."

*Id.* (internal citations omitted).

In this case, as already noted, the trial court concluded that Vidafuel's June 1, 2023, commencement of litigation was untimely because the cause of action for a TCPA claim accrued "at the very latest . . . when the defendant Kerry . . . 'conceded defeat' as cited in paragraph 25 of the complaint. And that was March of 2022." We agree.

To recap, the amended complaint makes plain that Vidafuel was aware, well over a year prior to the commencement of litigation, of Kerry's repeated failure to manufacture

- 12 -

the Products appropriately. The first shipment of the Products by Kerry generated "numerous customer complaints," not only pertaining to the consistency of the Products, but also concerning "leaks caused by improper packaging." Vidafuel was forced to provide refunds to its customers, and in the wake of this failed shipment, Vidafuel was informed that there had been a machine failure at the Savannah plant. Vidafuel has alleged that the first shipment had "disastrous consequences," including loss of market share, "due to Kerry." The shipment clearly prompted concern in Vidafuel, as the amended complaint specifically detailed as follows: "Concerned with the quality standards of the manufacturing processes at the Savannah plant, [the Vidafuel CEO] asked for production to be moved to another Kerry plant." Although Kerry represented that issues at the plant had been resolved and that the next production run would be successful, additional setbacks and production failures followed.

Although Kerry represented that the Products would be available to ship again by December 30, 2021, it later informed Vidafuel toward the end of that December that "it needed a 4-week observation period before it would release the Berry Product." Kerry informed Vidafuel that foaming had occurred in Vidafuel's Mixed Berry Protein Beverage during production, which it explained "was likely a result of a processing issue." So, yet again, Vidafuel was put on notice of issues with Kerry's ability to produce the Products. Moreover, although additional assurances were allegedly provided in the run up to the second shipment that the Savannah facility was capable and that the "next production run would be run correctly," the second shipment was also "non-conforming." Vidafuel was forced to pull its inventory from the market, and in March 2022, Kerry "conceded defeat" and notified that it was terminating the MSA. Although Vidafuel argues that, even then, Kerry continued to maintain that it was capable of producing the Products, we are of the opinion that, at that point, based on the allegations of the amended complaint, "no reasonable trier of fact could conclude that [Vidafuel] did not know, or in the exercise of reasonable care and diligence should not have known, that [it] was injured as a result of the defendant's wrongful conduct." *Schmank*, 2008 WL 2078076, at *3. In this respect, we are not persuaded by Vidafuel's insistence that it did not truly discover significant issues at the Savannah plant until the June 3, 2022, Teams call that occurred. Again, "[t]he plaintiff is deemed to have discovered the right of action when the plaintiff becomes aware of facts sufficient to put a reasonable person on notice that he or she has suffered an injury as a result of the defendant's wrongful conduct." *Pero's Steak & Spaghetti House*, 90 S.W.3d at 621. Moreover, once a plaintiff gains information that is sufficient to alert a reasonable person of the need to investigate the injury, the limitation period begins to run. *Eldridge*, 2017 WL 5901028, at *5.

Even if, arguendo, we were to regard Kerry's reassurances in the wake of the failed second shipment as justifying a tolling of the limitation period (which we do not), we note that additional information about Kerry's production capabilities, or lack thereof, followed when samples were sent to Vidafuel on May 31, 2022, during the period of time Kerry and Vidafuel worked together while Vidafuel looked for a new manufacturer. Per the amended

- 13 -

complaint, those samples, which were sent more than a year prior to the commencement of litigation, were the "least palatable product to date." Certainly by that date, "no reasonable trier of fact could conclude that [Vidafuel] did not know, or in the exercise of reasonable care and diligence should not have known, that [it] was injured as a result of the defendant's wrongful conduct." *Schmank*, 2008 WL 2078076, at *3.

Given our conclusion that the economic loss doctrine bars Vidafuel's common law tort claims and that the TCPA claim was not timely asserted, we affirm the trial court's judgment of dismissal.[8] Although Kerry has raised an issue concerning costs and attorney's fees under Tennessee Code Annotated section 20-12-119(c), this appeal does not present a proper occasion to in any way adjudicate Kerry's request for an award under the statute. As Kerry itself has noted, the award "shall be made only after all appeals of the issue of the granting of the motion to dismiss have been exhausted and if the final outcome is the granting of the motion to dismiss." Tenn. Code Ann. § 20-12-119(c)(3).

## CONCLUSION

For the reasons stated herein, we affirm the trial court's dismissal of the amended complaint.

s/ Arnold B. Goldin
ARNOLD B. GOLDIN, JUDGE

---

[8] To the extent our discussion has not addressed all issues raised by the parties in connection with the common law tort and TCPA claims, those issues are pretermitted in light of our discussion herein.